UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TEQUILLA MARIE DAWSON,

        Plaintiff,

                                     Case No. 19-cv-378-pp

    v.

RES-CARE INC., GARY RUDZIANIS,
STEVEN REINHOLD, AMANDA KLEET,
KATIE DZIEDZIC and STACEY ELLIS,

        Defendants.

---

**ORDER GRANTING DEFENDANTS' RULE 7(H) EXPEDITED NON-DISPOSITIVE MOTION FOR ATTORNEY FEES (DKT. NO. 120), DENYING PLAINTIFF'S MOTION TO DISMISS AWARD OF ATTORNEY FEES (DKT. NO. 124), GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 126), DENYING PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 127, 147) AND DISMISSING CASE**

---

After four years of litigation, the plaintiff—who has been representing herself since the inception of the case—has not complied with her discovery obligations. In 2021, Magistrate Judge William E. Duffin imposed sanctions; the plaintiff did not comply with his order. Dkt. Nos. 78, 85. Twice, the defendants have moved to dismiss the case based on the plaintiff's conduct. Dkt. Nos. 95, 109. The court denied their initial motion without prejudice, dkt. no. 108, but eventually granted the renewed motion in part and found that sanctions were appropriate based on a "pattern of willful delay and avoidance," dkt. no. 119 at 22. In addition to dismissing the plaintiff's claim under the Fair

1

Labor Standards Act, the court allowed the defendants to file a motion for reasonable expenses incurred because of the plaintiff's delay. Id. at 25-26.

The defendants' motion for attorney fees, dkt. no. 120, the plaintiff's motion to dismiss award of attorney fees, dkt. no. 124, and the parties' cross-motions for summary judgment, dkt. nos, 126, 127, now need resolution. The plaintiff recently filed a second motion for summary judgment—after the September 29, 2023 deadline for dispositive motions and without leave of the court. Dkt. No. 147. The plaintiff's approach to summary judgment tracks her approach to discovery—documents trickle in after the deadline has passed and her submissions do not comply with either this court's local rules or the federal rules.

The court will award fees and costs to the defendants relating to the plaintiff's failure to comply with her discovery obligations, will grant the defendants' motion for summary judgment, will deny the plaintiff's motions for summary judgment and will dismiss this case.

## I.    Procedural History

On October 16, 2017, the plaintiff filed a complaint in the Western District of Wisconsin alleging violations of Title VII, the Equal Pay Act and the Fair Labor Standards Act. Dkt. Nos. 1, 1-1. Chief Judge James Peterson screened the complaint, dkt. no. 5, and transferred the case to this district on March 13, 2019, dkt. no. 36. When the case arrived in this district, this court set deadlines based on the parties' Rule 26 report; it ordered the parties to complete discovery by April 17, 2020. Dkt. No. 43. Five and a half months into

the discovery process, the parties began filing letters and motions relating to discovery disputes/issues. Dkt. Nos. 46-51, 53-57, 60-68. This court eventually referred the discovery motions to Judge Duffin on January 12, 2021. Dkt. No. 77.

Two days later, Judge Duffin denied the plaintiff's motion to compel, granted the defendants' motion to compel and allowed the defendants to file a motion for expenses under Rule 37(a)(5). Dkt. No. 78. Judge Duffin reviewed the defendants' discovery requests, found them "quite routine and ordinary given the nature and scope" of the plaintiff's claims and found the plaintiff's answers "insufficient" and her objections "baseless." Id. at 6. Judge Duffin ordered the plaintiff to file full and complete responses to Interrogatories 5, 13, 14, 15, 16 and 18 and ordered her to produce discovery documents 10, 11, 12 and 15 within thirty days of the January 14, 2021 order. Id. at 8. Judge Duffin granted the plaintiff's motion for additional time to comply with the order, dkt. nos. 81, 82, and on March 3, 2021 he awarded the defendants $9,226.50 in costs and fees, dkt. no. 85.

This court scheduled a status conference for June 23, 2021, but the plaintiff did not appear. Dkt. No. 88. The defendants' attorney informed the court that he had not received all the requested discovery from the plaintiff and that he had been unable to get in touch with her via email for several weeks. Id. The court issued an order requiring the plaintiff to show cause why she did not appear for the conference and to indicate whether she intended to pursue the case. Dkt. No. 89.

The plaintiff responded to the order to show cause, explaining that she had had "several altercations that ha[d] led up to incidents preventing [her] from responding to the court Order." Dkt. No. 90. She generally alleged that someone had broken into her home, that someone had stolen her identity, that someone had changed her mailing address and that someone locked her out of personal email accounts. Id. She said that she had "had to remove" herself from her residence because she had been stalked, harassed and threatened. Id. She claimed that as a result, she was unaware of litigation-related correspondence. Id.

The court scheduled a hearing at which it discharged the order to show cause. Dkt. No. 94. At the same time, the court allowed the defendants to file a motion asking the court to dismiss the case as a sanction for the plaintiff's failure to comply with Judge Duffin's order. Id. at 3. The defendants filed a motion to dismiss under Rule 37, dkt. no. 95, and the court scheduled a status conference and warned the plaintiff that her failure to appear could result in the dismissal of the case, dkt. no. 102.

During the June 29, 2022 status conference, the court explored why the case had not progressed beyond the discovery stage. Dkt. No. 107 at 1. The plaintiff said that she believed that she had complied with the discovery requests by signing release forms. Id. Defense counsel responded that he had not heard from the plaintiff since March 2021 and he pointed out that the plaintiff had not responded to the motion to dismiss. Id. at 2. The court followed up with questions regarding the signed release forms and gave the

defendants an opportunity to provide the court with the date their office had received the signed forms. Id. The court admitted that it "was not clearer today on why the plaintiff had not complied with Judge Duffin's order than it had been before the hearing." Id.

After receiving the defendants' declarations, the court found that the plaintiff had "established a patten of failing to comply with court orders, failing to file documents and focusing on her own concerns rather than responding to those of the court." Dkt. No. 108 at 26. The court outlined the plaintiff's actions (and inactions) that led to this finding. Id. at 26-36. The court rejected the plaintiff's arguments that she had complied with Judge Duffin's order by signing and returning the release authorizations because Judge Duffin's order had made it clear that she needed to provide "additional, detailed information in response to the defendants' discovery demands." Id. at 36. The court found that the documents in the record established that the plaintiff knew that her responses were still deficient after she provided the signed release authorizations. Id. at 37. The court recounted that the plaintiff still had failed to respond to the motion to dismiss but that she had referred to "back-to-back sensitive incidents" without any explanation as to why these incidents, whatever they were, had prevented her from complying with Judge Duffin's order or responding to the outstanding motions. Id. at 38. The court recounted that the plaintiff never had explained the incidents and had received multiple extensions of time to do things that she still had not done. Id. at 39. Specifically, the plaintiff had consistently missed deadlines, failed to comply

5

with a detailed order from Judge Duffin, missed a hearing and required the court to issue an order to show cause and had "vague and mysterious explanations" for failing to provide the discovery requested by the defendants. Id. Despite all of those failings, the court gave the plaintiff "one, final opportunity to comply with the defendants' discovery demands." Id. at 40. The court ordered the plaintiff to comply with Judge Duffin's order in fourteen days and recounted specifically what the plaintiff must provide with respect to each interrogatory. Id.

On July 22, 2022, the defendants renewed their motion asking the court to sanction the plaintiff by dismissing the case. Dkt. No. 109. Three days later, the plaintiff asked for additional time to comply with the discovery demands (asserting that she was not receiving her mail). Dkt. No. 111. The court ordered the plaintiff to serve outstanding discovery responses by the end of the day on August 12, 2022, and ordered the defendants to advise the court by August 17, 2022 whether the plaintiff had complied. Dkt. No. 112. The plaintiff filed supplemental responses on August 11 and 12, 2022, dkt. nos. 114, 115, and the defendants filed a letter representing that the discovery responses were incomplete, dkt. no. 116.

On March 7, 2023, the court granted in part the defendants' renewed motion to dismiss, dismissed the plaintiff's Fair Labor Standards Act claims, allowed the defendants to file a motion for costs and ordered the defendants to file a status report advising the court whether they believed that further discovery was necessary. Dkt. No. 119. In that order, the court found that the

6

plaintiff had engaged in a "pattern of willful delay and avoidance" based on her failure to appear for the June 23, 2021 hearing, her failure to respond to calls from the court's staff and her failure to comply with Judge Duffin's order in the ten months following its issuance. Id. at 22, 23. The court pointed out that the plaintiff continued to ask for extensions after the court told her that there would be no more extensions. Id. at 23. Even after the court warned the plaintiff that it would dismiss her case, the plaintiff had provided the bare minimum of discovery and the information she had provided was incomplete. Id. at 24. The court wrote:

> [T]he information she has provided is of no use to the defendants in determining whether they did, in fact, fail to pay the plaintiff overtime, on what dates and for how much time. So the defendants are no more able today to defend against the plaintiff's claim that she was not paid for overtime than they were three years ago.
>
> Because it appears that the plaintiff attempted to provide information responsive to interrogatory no. 5, the court is uncomfortable dismissing the entire case. It should not have taken the plaintiff as much time as it did to provide the information. It should not have taken the court having to explain to the plaintiff exactly what information she needed to provide. It should not have taken the defendants filing more than one motion to dismiss. But the plaintiff does appear to have tried to provide information that, in her mind, was responsive to interrogatory no. 5.
>
> That said, the plaintiff's delays have dragged this litigation out for an unacceptable amount of time. The court is responsible for some of that delay—it gave the plaintiff opportunity after opportunity to comply with Judge Duffin's order and with this court's orders. It granted the plaintiff extensions even when it said it would not do so. All the while, the defendants have been waiting to get information that would enable them to figure out the dates and times on which the plaintiff alleged that she worked unpaid overtime and how much unpaid overtime she claimed to have worked. Despite all the delays, the defendants still do not have this information. A sanction is warranted, even if it is not the most severe sanction of dismissal of the entire case.

7

<u>Id.</u> at 24-25

The defendants filed their Rule 7(h) expedited non-dispositive motion for attorneys' fees, dkt. no. 120, a declaration, dkt. no. 121, and a status report regarding outstanding discovery requests, dkt. no. 122. The court ordered the parties to complete discovery by August 15, 2023 and to file dispositive motions by September 29, 2023. Dkt. No. 123.

On March 29, 2023, the plaintiff filed a motion to dismiss the court's award of attorney fees. Dkt. No. 124. Both parties have filed motions for summary judgment. Dkt. Nos. 126, 127, 147. The plaintiff has not responded to the defendants' proposed findings of fact or cited to the record. Two months after expiration of the summary judgment deadline, the plaintiff filed her second motion for summary judgment—identical to the first—with a declaration and additional exhibits.

## II. **Attorneys' Fees**

### A. <u>Defendants' Rule 7(h) Expedited Non-dispositive Motion for Attorney Fees</u> (Dkt. No. 120)

The defendants filed their motion for attorneys' fees after the court had partially granted their renewed motion asking the court to sanction the plaintiff for her noncompliance by dismissing the case. Dkt. No. 120. The defendants assert that they have incurred and paid a total of $7,326.50 in attorneys' fees due to being forced to file the October 29, 2021 motion to dismiss, and a total of $5,415.50 for having to file a renewed motion to dismiss—for the same reasons—a year later. <u>Id.</u> at 2-3. While the defendants represent that they have

8

total fees of $12,742.00, they are willing to ask the court to order only $10,000 in an "effort to limit argument surrounding the reasonableness" of their fee request and "in recognition of the court's already strained resources." Id. at 3. They ask that the court make the award payable within fifteen days of entry of its order. Id. In support of the motion, the defendants filed a declaration and an itemization of the hours billed. Dkt. Nos. 121, 122.

The plaintiff did not file a brief in opposition to the motion, but she did file a motion to "dismiss" the court's award of attorneys' fees.

B.     Plaintiff's Motion to Dismiss Award of Attorney Fees (Dkt. No. 124)

Six days after the defendants filed their motion for attorneys' fees, the plaintiff filed a document titled "Plaintiff Motion to Dismiss Award of Attorney's Fees Pursuant to Fed. R. Civ. P. 37(a)(5)." Dkt. No. 124. The plaintiff says that "[a]lthough the courts recognize my intent or attempt to comply with the Court's earlier Order," she now realizes that "the execution was poor and insufficient." Id. at 1. She insists that she intended to act in accordance with the rules and laws, argues that the "courts have relieved the Defendants under Federal rule 37 standards" and says that she has endured a penalty already. Id. She says, "Despite the court's unrequired explanations and extensions, the Plaintiff complied with the court's earlier Order, however, incidents prevented acts in one way or another." Id. She asks the court to "note" that she "never attempted to delay or appear uncooperative;" she says that "intentions were to utilize limited resources to defend and support the claim per Plaintiff understanding of Federal Rules." Id. She maintains that awarding costs would

9

disadvantage her in the litigation or cause undue hardship, preventing her from litigating against the defendants. Id. According to the plaintiff, the "American Rule" requires the parties to bear their own costs and the plaintiff should not be deterred from a bringing a case for fear of the costs. Id. at 2. She cites a variety of rules and statutes, including the Equal Access to Justice Act, in support of her argument that costs should not be awarded or that fees should be capped at $125 per hour. Id. at 2-3. She also points out that the court already has imposed one sanction by dismissing the FLSA claim. Id. at 2.

Under Rule 37(a)(5), there is a presumption that a party against whom a court grants a motion to compel pays the victor's reasonable expenses, including attorneys' fees. Rickels v. City of South Bend, 33 F.3d 785, 786 (7th Cir. 1994) ("The great operative principle of Rule 37(a)[ (5) ] is that the loser pays."). The problems created by the plaintiff's failure to comply with the defendants' discovery demands date back almost three years, to January 14, 2021, when Judge Duffin granted the defendants' motion to compel and ordered the plaintiff to comply with the defendants' requests. Dkt. No. 78. In the two years following Judge Duffin's order, the plaintiff did not provide the defendants with any meaningful discovery. The defendants renewed their motion to dismiss after the plaintiff missed yet another deadline; the court partially granted their motion by dismissing the FLSA claim and gave the defendants leave to file a Rule 37(a)(5) motion for costs. Dkt. No. 119.

None of the arguments in the plaintiff's motion to dismiss the award of attorneys' fees address her failure to comply with Judge Duffin's order. The

10

court explained to the plaintiff that signing releases did not respond to the defendants' outstanding discovery requests. The plaintiff claims that she now understands that the "execution" of that compliance was "poor and insufficient," but continues to make vague, unsupported assertions about obstacles (identified and unidentified) that prevent her from complying.

In October 2017—over five years ago—the plaintiff chose to file this case in federal court. The court has been mindful that the plaintiff does not have a lawyer and is representing herself, and over those years has given her multiple extensions of time and opportunities to comply with Judge Duffin's order and its own. But case law is clear that even unrepresented litigants must comply with court rules. Pearle Vision, Inc. v. Romm, 541 F.3d 751, 758 (7th Cir. 2008) (citing McNeil v. United States, 508 U.S. 106, 113 (1993) (noting that the Supreme Court has "never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel")). Like anyone who seeks to use the federal courts for resolution of their disputes, the plaintiff must follow the Federal Rules of Civil Procedure, this court's local rules and orders from judges. She has not done so and has not provided a satisfactory explanation for why she has not done so.

The court will award reasonable expenses, including fees, incurred by the defendants in attempting to obtain necessary discovery and in filing multiple motions to compel and to dismiss. Having reviewed the declaration of defendants' counsel and the attached time sheets, the court is satisfied that the costs and fees the defendants are requesting are reasonable and are the

11

result of the plaintiff's continued pattern of noncompliance. The plaintiff's conduct has delayed this litigation and created unnecessary expenses for the defendants. The court will award the defendants $10,000 (in addition to the still-upaid $9,226.50 in sanctions imposed by Judge Duffin on March 3, 2021, Dkt. No. 85).

## III. Summary Judgment Motions

### A. Summary Judgment Standard

"Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." Reed v. Brex, Inc., 8 F.4th 569, 578 (7th Cir. 2021) (quotation omitted). A party opposing summary judgment "must go beyond the pleadings . . . to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in his favor." Burton v. Kohn L. Firm, S.C., 934 F.3d 572, 579 (7th Cir. 2019) (cleaned up).

The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. Khungar v. Access Cmty. Health Network, 985 F.3d 565, 572-73 (7th Cir. 2021). However, the court considers only the materials cited by the parties,

see Federal Rule of Civil Procedure 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. Grant v. Trs. of Ind. Univ., 870 F.3d 562, 573-74 (7th Cir. 2017).

  B.  Defendants' Motion for Summary Judgment (Dkt. No. 126)

The defendants ask the court to dismiss the remaining Title VII and Equal Pay Act claims against Res-Care. Dkt. No. 128 at 1. First, they argue that the sex-based hostile work environment claim fails because (1) there is no evidence that the comments or acts the plaintiff relies on were based on her sex, (2) the plaintiff cannot produce evidence that she was subjected to severe or pervasive harassment that altered the conditions of her employment and (3) the plaintiff has not shown that Res-Care was liable for the sexual harassment she alleges. Id. at 20-28. The defendants argue that the plaintiff's retaliatory discharge claim fails because (1) the plaintiff did not engage in protected activity prior to the termination decision, (2) the principal decisionmaker relative to termination, Steven Reinhold, was unaware of the alleged protected activity prior to making the decision and (3) Res-Care has a legitimate, non-retaliatory reason for terminating the plaintiff's employment. Id. at 12-19. Finally, the defendants argue that the Equal Pay Act claim fails because the undisputed record evidence establishes that the plaintiff was paid the same hourly rate as her sole comparator, James Stahl, for the entirety of her employment. Id. at 1, 9-10.

The plaintiff did not file a brief in opposition to the defendants' summary judgment motion or respond to the defendants' proposed findings of fact, even

though the defendants provided the plaintiff with copies of the Local and Federal Rules governing summary judgment procedure. Dkt. No. 126 at 2-10.

C.    <u>Plaintiff's Summary Judgment Motions</u>

1.    *Plaintiff's First Motion for Summary Judgment*

a.    Plaintiff's Brief and Exhibits (Dkt. No. 127)

The plaintiff moved for summary judgment and cited Rule 56, but did not include the "statement of proposed material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law," as required by Civil Local Rule 56(b)(1)(C) (E.D. Wis.). The court's local rules state that failure to submit such a statement constitutes grounds for denial of the motion. Civil L.R. 56(b)(1)(C)(iii).

The plaintiff asserts that the "undisputed evidence submitted by Plaintiff demonstrates that ResCare intentionally discriminated against the Plaintiff, intentionally withheld wages, and intentionally terminated [her] employment after and during reported claims of discrimination, harassment, retaliation, etc." Dkt. No. 127 at 1. With no citations to the record, the plaintiff claims that she reported her complaints of discrimination, harassment and retaliation to Res-Care, and that she was terminated on August 21, 2015, causing her "public humiliation and wrongful termination." <u>Id.</u> at 2. She maintains that an administrative law judge stated on the record that she was wrongfully terminated and that the stated reasons didn't "follow policy and or protocols." <u>Id.</u>

The plaintiff claims that Res-Care "intentionally ensured Plaintiff would be restricted from state benefits" because she was eligible for benefits through their program. Id. Again, without citations to the record, she contends that Steven Reinhold, Amanda Kleet and Gary Rudzianis were aware of and were investigating her complaints. Id. She claims that months prior to her termination, she demanded an investigation, and that Reinhold said he would rectify the situation and initiate the investigation. Id. at 2-3. Without providing any time frame or citing to record evidence, the plaintiff says:

> The Defendant's Steven, Katie, Stacy and Amanda (appeared by phone) attacked the Plaintiff in the Plaintiff office with client. The client was removed, and the attacks and threats continued. Steven Reinhold stated the Plaintiff would physically be removed from the premises if I did not leave now. The Plaintiff expressed the need to retrieve personal items and space to do so without being attacked, threatened and or humiliated among peers and client. The Plaintiff demanded a police officer be called to assist the Plaintiff in leaving the premises. Steven advised Stacy or Amanda to read my final corrective action letter and explain my effective termination with ResCare. Amanda advised Stacy to read the documents. Stacy read the documents and they all laughed at once and said, "now you have a permanent vacation as you have requested starting now; you are fired!" All the adverse actions lead to intentional harm. Ultimately resulting in wrongful termination. ResCare intentionally planned and sought out to tactfully terminate my employment due to filing complaints. Also James Stahl was being pressured into reporting that I stole his XAR #. James Stahl refused to fabricate and said no he would not do it. After my termination, Stacy Ellis told Gloria Knight it was either my termination or hers during a visit to Walworth County. She expressed to Gloria, she had to pick. Stacy Ellis employment continued after my termination.

Dkt. No. 127 at 3. As a final example of harassment, the plaintiff says that in July of 2015, Ellis threatened to have her husband (an officer in Illinois) track the plaintiff down and "do you, like they, did Sandra Bland!" Id. at 4.

The plaintiff included paragraphs labeled "facts":

15

1.  Defendant failed to follow company policies, procedures and abide by the antidiscrimination laws as an employer in Wisconsin.

2.  Mary Dixon was not terminated on 05/21/2018. ResCare held a retirement party during May or June of 2015. During this event, the Plaintiff filed another complaint with ResCare regarding Mary inappropriate behaviors in the workplace. Per the complaint there was a meeting held. The investigation concluded by informing the Plaintiff to endure the mistreatment for a few more days until her retirement. If I did not, she would not qualify for retirement per ramifications sought. Plus, her position would be replaced by someone else "rectifying the discrimination complaint."

3.  Kim Savage was not terminated on 05/21/2018. ResCare ended her employment during or around the time of the Plaintiff investigation. Kim Savage and other staff breach confidentiality. Plaintiff informed ResCare of breach of confidentiality, harassment, and hostile work environment.

Id. The plaintiff asserts that there is a "ponderous amount of evidence submitted to the courts that support the Plaintiff claims." Id. at 5. She accuses the defendants of failing to provide "authentic and accurate documentation" and questions the "legitimacy, accuracy and inconsistency of material fact." Id.

The plaintiff attached ninety-three pages of exhibits. Dkt. No. 127-1. She included the Human Resources Policy & Practice Manual, the Wisconsin Web Access Management System User Acceptance Agreement, a notice of complaint filed in an Equal Rights Division case, documents filed with the crime information bureau, documents relating to the violations surrounding her termination and her unemployment claim, an email that she purportedly sent to Sandra Corey on July 17, 2014 regarding Mary Dixon (the receptionist at the Walworth County Job Center) and a second email to Karen Burns about Mary

16

Dixon, correspondence regarding overtime, her offer of employment and earnings statements. Id. at 1-93.

> b. Defendants' Brief in Opposition (Dkt. No. 141)

The defendants oppose the plaintiff's motion on the ground that the undisputed facts in the record demonstrate that the defendants—not the plaintiff—are entitled to judgment as a matter of law. Dkt. No. 141 at 1. They argue that the plaintiff has no proof to support her "bald assertions" and that her motion fails to comply with the Federal Rules of Civil Procedure and the Civil Local Rules governing the summary judgment process. Id. at 2. The defendants point out that the plaintiffs' three proposed findings of fact are not supported by the record and are nothing more than conclusory allegations that parrot legal conclusions. Id. Specifically, the plaintiff did not file a memorandum of law even though the defendants provided her with a copy of the relevant rule requiring one. Id. at 4 (referencing Dkt. No. 126). They assert that the plaintiff failed to provide a statement of facts supported by citations to the record. Id. at 5. The defendants argue that instead, the plaintiff filed "an almost incomprehensible six-page narrative, with a brief reference to three paragraphs of unsupported 'facts' along with 93 pages of unauthenticated and unexplained documents." Id.

The defendants ask the court to ignore the plaintiff's comments relating to the FLSA claim because that claim was dismissed. Id. at 7. They continue to maintain that the Equal Pay Act claim is baseless because the plaintiff was paid the same salary as Stahl—the only comparator. Id. at 9. They refute any

17

challenges to authenticity because Reinhold is a qualified witness familiar with Res-Care's record-keeping practices. Id. at 10.

The defendants maintain that the retaliation claim fails because the only email sent to the decisionmaker, Reinhold, had nothing to do with the case at hand and he had no knowledge of any complaints or actions protected by Title VII. Id. at 12. The plaintiff has not refuted the fact that by sharing Stahl's XAR number and logging credentials, she violated a policy she was made aware of as part of onboarding and that she and Stahl were terminated at the same time. Id. at 13. According to the defendants, there is no evidence of pretext on their part in the "six-page narrative or 93-page accompaniment of 'exhibits'" proffered by the plaintiff. Id. They assert the fact remains that Reinhold conducted an investigation and Stahl and the plaintiff were fired on the same day for the same reason. Id.

The defendants say that the plaintiff cannot support a claim for hostile work environment sexual harassment because she allegedly was harassed by a woman who was not employed by Res-Care and that none of the alleged statements appear to be motivated by gender. Id. at 14. The defendants also argue that even if the alleged statements and conduct on the part of the plaintiff's former supervisor, Stacy Ellis, are true, they are "mere inappropriate offensive behavior" bearing no connection to the plaintiff's gender and that nothing appears to be so severe or pervasive as to have altered the terms of the plaintiff's employment. Id. at 15.

18

Finally, the defendants say that the plaintiff is not entitled to punitive and liquidated damages because there is no viable claim for liability and there is nothing in the plaintiff's exhibits to support such a request. Id. at 17.

2. *Plaintiff's Second Motion for Summary Judgment* (Dkt. No. 147)

On November 7, 2023—more than a month after the September 29, 2003 deadline for filing dispositive motions expired—the court received from the plaintiff a second motion for summary judgment. Dkt. No. 147. The plaintiff did not ask the court to extend the summary judgment deadline and did not ask permission to file a summary judgment motion after the deadline had expired. The second, untimely motion is identical to the first motion. The only difference is that the plaintiff attached to the second motion a three-page declaration and additional exhibits. Id. at 147-1.

The court will not consider the untimely filings. This is the type of conduct that caused two judges on this court to impose sanctions on the plaintiff.

D.    Findings of Fact

The court has adopted the defendants' unopposed proposed findings of fact to the extent they are supported by the record because, as noted, the plaintiff did respond to those findings as required by Civil L.R. 56(b)(2).[1] Civil

---

[1] Civil Local Rule 56(b)(2)(B)—a copy of which the defendants provided the plaintiff—requires the non-moving party to file "a concise response to the moving party's statement of facts that must contain: (i) a reproduction of each numbered paragraph in the moving party's statement of facts followed by a response to each paragraph, including, in the case of any disagreement, specific references to the affidavits, declarations, parts of the record, and other

L.R. 56(b)(9) states that failure to comply with the local rules governing summary judgment "may result in sanctions up to and including the Court denying or granting the [summary judgment] motion."

        1.    *Res-Care*

Between June 16, 2024 and August 21, 2015, Res-Care served as the nation's largest provider of services to persons with disabilities. Dkt. No. 135 at ¶1. Res-Care offered its clients residential support services, education and vocational training and job placement. Id. Res-Care often contracted with state and local entities to provide these services. Id. at ¶¶1, 2. Throughout this same period, Res-Care had a contract with the State of Wisconsin to provide certain employment and training related services to individuals in Southeastern Wisconsin (the "Wisconsin Contract"). Id. at ¶2. In Walworth County, Wisconsin (where the plaintiff worked), Res-Care shared the building and some limited resources with Kaiser, Dynamic Workforce Solutions and Gateway Technical College. Id. at ¶4.

The plaintiff sued several Res-Care employees. Gary Rudzianis worked as an Internal Consultant at Res-Care overseeing the FSET [Food Share Employment and Training] Program subcontractors. Dkt. No. 132 at ¶¶1, 2. Steven Reinhold initially served as an Operations Manager before his

supporting materials relied upon, and (ii) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, declarations, parts of the record, and other supporting materials relied upon to support the facts described in that paragraph. A non-moving party may not file more than 100 separately-numbered statements of additional facts. Each separately-numbered paragraph shall be limited to one material fact."

promotion to Project Director. Dkt. No. 135 at ¶¶3, 5. As project director, Reinhold's job duties included leadership and direction for employment and training contract implementation for all Southeast Wisconsin. Id. at ¶5. Amanda Klett was Manager of Human Resources for Res-Care. Dkt. No. 131 at ¶1. Klett's job duties included oversight of discipline of Res-Care employees and ensuring compliance with Res-Care policies. Id. at ¶¶2, 3, 4. Katie Dziedzic initially worked as the Operations Supervisor but received two promotions—to Operations Manager and then to Deputy Project Manager. Dkt. No. 133 at ¶1. Dziedzic reported to Reinhold as deputy project manager; her duties included supervision of assigned staff and direction for employment and training contract implementation for all of Southeast Wisconsin. Id. at ¶¶2, 3, 4. Finally, Stacy Ellis started as Case Manager but became the plaintiff's supervisor in January 2015 when she was promoted to Case Manager Supervisor. Dkt. No. 134 at ¶¶1-3. Ellis's job duties included supervision of case managers, approving leave time, conducting training, delivering employee discipline and completing performance reviews, in addition to other duties. Id. at ¶2.

### 2. *Plaintiff's Employment*

On June 4, 2014, Res-Care sent the plaintiff a formal offer of employment to become a Case Manager. Dkt. Nos. 135 at ¶8; 135-2 at 2. The plaintiff began working for Res-Care on June 16, 2014, earning $19.24 per hour for the entirety of her time there. Id. at 14-44. The plaintiff earned time and a half for overtime hours (or $28.86 per hour). Id. Res-Care also hired

21

James Stahl as a Case Manager; Stahl began working the same day as the plaintiff. Dkt. Nos. 135 at ¶9; 135-4 at 2. Stahl earned the same hourly wage as the plaintiff the entire time he worked at ResCare. Id. at 3-33. The two had the same job title and same duties throughout their employment at Res-Care. Dkt. Nos. 135 at ¶¶8, 9; 135-2 at 2; 135-4 at 2. Res-Care case managers (like the plaintiff and Stahl) were responsible for developing and implementing service plans, documenting consumer progress or regression and ensuring consumer and guardian participation in the development of service and personal future plans. Dkt. Nos. 135 at ¶8; 135-2 at 7-8.

   3. *Company Policies*

  Res-Care's policies banned discrimination and harassment of any employee because of race, color, religion, sex, national origin, age, disability, veteran status, political affiliation or genetic information. Dkt. Nos. 135 at ¶14; 135-9. Res-Care maintained policies prohibiting retaliation and issued all employees a Prohibition of Harassment statement. Dkt. Nos. 135 at ¶¶17, 18; 135-8; 135-11, 135-14. All employees underwent training on the company policies; after completing the training, these employees were administered a test. Dkt. Nos. 135 at ¶¶18, 19; 135-15. Res-Care also maintained a "Compliance Action Line" for its employees to report (anonymously if desired) concerns regarding sexual harassment, retaliation or any other conduct violative of the law or policies of the company. Dkt. Nos. 135 at ¶18; 135-13.

  Res-Care maintained Policies Regarding Compliance Issue Reporting and Conducting Investigations. Dkt. Nos. 135 at ¶18; 135-12; 135-13. Under the

policy on conducting investigations, there were specific guidelines management was required to follow in investigating complaints of sexual harassment or other improper conduct. Dkt. Nos. 135 at ¶18; 135-12. The plaintiff executed an employment acknowledgement form on June 14, 2014, stating that she had reviewed the company's policies and agreed to follow them. Dkt. Nos. 135 at ¶17; 135-11. Reinhold avers that the plaintiff never complained to him that she was being discriminated against and never asked him to investigate a claim of discrimination or any other violation of law or company policy. Dkt. No. 135 at ¶23.

Additionally, Res-Care maintained a Systems Security Policy governing the use of the Res-Care computer systems. Dkt. Nos. 135 at ¶10; 135-5. Adopted as part of an effort to maintain the security of the company's computer systems, the policy forbids employees from sharing the unique user identification number assigned to them ("XAR number") and any other login credentials. Dkt. Nos. 129 at ¶10; 135-5. The plaintiff received a copy of the policy at the start of her employment and signed off on the Company's User Reference Guide Agreement form, which states in part, "UNAUTHORIZED ACCESS OR MISUSE OF COMPUTER RESOURCES OR DISCLOSURE OF CONFIDENTIAL INFORMATION MAY RESULT IN PROGRESSIVE CORRECTIVE ACTION, UP TO AND INCLUDING TERMINATION, AND/OR LEGAL RAMIFICATIONS." Dkt. Nos. 135 at ¶12; 135-7. On June 17, 2014, the plaintiff underwent training on the company's security systems policy to ensure that she knew what was expected of her relative to the company's information

23

security protocols. Dkt. Nos. 135 at ¶11; 135-6. The plaintiff acknowledged and completed the Employment Eligibility Certification Form on June 16, 2014, and initialed next to paragraph C which stated, in part: "I understand that any violation of the Code of Conduct or any other corporate compliance policy or procedure is grounds for progressive corrective action, up to and including termination from employment." Dkt. Nos. 135 at ¶16; 135-10. Finally, Res-Care employees were required to adhere to the terms and conditions of the Wisconsin Web Access Management System User Acceptance Agreement ("WAMS agreement"), which prohibited Res-Care employees from sharing their XAR number and other login credentials with others. Dkt. Nos. 135 at ¶2; 135-1.

### 4. *Plaintiff's Infractions*

On July 14, 2014, the plaintiff received corrective action in the form of a Counseling Statement for "Punching In and Out Early and Late" and "Staying Past 4:30 Unaproved (sic)." Dkt. Nos. 135 at ¶8; 135-2 at 13. The Corrective Action Form identifies several dates when the plaintiff clocked in prior to 8:00 a.m. or clocked out after 4:30 p.m. Id. The form states that "Tequilla must record her time at 8:00 am, which is her start time[;] 8:00 am – 4:30 pm our (sic) her correct hours." Dkt. No. 135-2 at 13.

On June 11, 2015, the plaintiff sent an email to Karen Burns regarding her "festering concerns" about Mary Dixon. Dkt. Nos. 135 at ¶8; 135-3 at 2-5. Both Karen Burns and Mary Dixon were employed by a separate, unrelated business located in the same building where Res-Care operated. Dkt. No. 135

at ¶6. At no point did Res-Care supervise, control or manage Burns or Dixon. Id. Although the email is not entirely clear, the plaintiff appears to have reported that on June 10, 2015, Dixon offered or gave the plaintiff's client the contact information for the plaintiff's supervisor so that the client could file a complaint about the plaintiff and that Dixon did this "out of spite." Dkt. Nos. 135 at ¶8; 135-3 at 5. The plaintiff's email did not reference sex or race. Id. The same email exchange reflects (although it is not clear who said it) that Dixon was retiring in four days, that she would be advised not to solicit a customer to reach out to management and that "we"—presumably Karen Burns's company—would ensure that Dixon's replacement understood the procedure for providing a customer the contact information for a manager. Dkt. Nos. 135 at ¶8; 135-3 at 2.

On June 16, 2015, the plaintiff received a corrective action in the form of a "1st Written Warning for violation of Company Policy B4, 'Disregard time reporting procedures,'" delivered by Ellis, Dziedzic and Klett. Dkt. Nos. 129 at ¶49; 135-2 at 11-12. The form identifies occurrences on April 21, April 22, April 29, May 1, May 28, May 29, and June 9, 2015, when the plaintiff clocked in early, and an occurrence on May 14, when the plaintiff worked eight and a half hours and took a late lunch without approval. Dkt. Nos. 135 at ¶8; 135-2 at 11. The form also includes summaries of emails sent to the plaintiff on May 4, May 18 and June 1, 2015, in which Ellis gave the plaintiff detailed instructions about adherence to the Res-Care eighty-hour per pay period policy

and reminded the plaintiff of the Res-Care policy regarding clocking. Dkt. Nos. 129 at ¶51; 135-2 at 11.

On July 27, 2015, the plaintiff was having difficulty logging into the State of Wisconsin's Cares Worker Web portal with her login credentials. Dkt. Nos. 135 at ¶8; 135-2 at 6; 130 at ¶3. At the time, the plaintiff had a client who had been waiting for an hour while she was unable to log in, so Stahl provided the plaintiff with his XAR number and password for the plaintiff to use to log in. Dkt. No. 130 at ¶3. That same day, Alexis Gardella, a Res-Care Quality Assurance Analyst, received a call from the plaintiff regarding pin comments and employability plans. Dkt. Nos. 135 at ¶8; 135-2 at 6. During the conversation, Gardella asked the plaintiff why Stahl's XAR identifier was showing on "what [they] were discussing." Id. The plaintiff told Gardella that she had used Stahl's XAR identifier for two days because the plaintiff had been unable to log in and, due to her heavy workload, hadn't yet contacted anyone to resolve the problem. Id. Gardella spoke with her manager; they determined "that the error was egregious and would require review." Id. She then forwarded the information about the misconduct to Ellis, the plaintiff's supervisor. Id.

On or around July 27, 2015, Ellis questioned Stahl about the plaintiff's use of his login information. Dkt. No. 130 at ¶4. That same day, Reinhold was informed that the plaintiff and Stahl may have violated the company's system security policy and the WAMS agreement. Dkt. No. 135 at ¶20. As a result, Reinhold conducted a review of the factual circumstances surrounding the potential policy violations. Id. During the review, Stahl admitted that he gave

26

the plaintiff his XAR number and password so that she could access the State of Wisconsin's Cares Worker Web portal and input information regarding one of her clients. Id.; Dkt. No. 130 at ¶4. Based on his conclusion that they violated the WAMS agreement and the company's security systems policy by virtue of Stahl sharing his login credentials and the plaintiff using those login credentials to access the State of Wisconsin's Cares Worker Web portal, Reinhold consulted with the company's then-regional manager of human services and made the decision to terminate the plaintiff and Stahl's employment. Dkt. No. 135 at ¶21.

           5.      *Plaintiff's Termination*

After determining that the plaintiff and Stahl had violated the WAMS agreement and the company's security systems policy, Reinhold informed the State of Wisconsin manager in charge of the Wisconsin Contract. Id. at ¶22. The plaintiff and Stahl were terminated on the same day—August 21, 2015. Dkt. Nos. 135 at ¶8; 135-2 at 9-10; 130 at ¶2, 5; 130-1. Res-Care did not base the decision to terminate on either employee's race or gender. Dkt. No. 135 at ¶25. At the time of the termination and after the termination, the plaintiff held the belief that Reinhold was the sole decision maker. Dkt. No. 136-1 at 2, Tr. p. 107, lines 23-25; 3, Tr. p. 108, lines 1-5.

The plaintiff never complained to Reinhold that she had been discriminated against or subjected to any type of harassment. Dkt. No. 135 at ¶23. Nor did the plaintiff ever ask Reinhold to investigate a claim of discrimination or any violation of law or company policy. Id. At no point had

27

Reinhold ever received an email from the plaintiff about alleged discriminatory, harassing or retaliatory conduct. Id. Reinhold never was aware of anyone at Res-Care retaliating against the plaintiff on any basis or harassing the plaintiff based on her gender or any other basis. Id. at ¶26. During the plaintiff's employment at Res-Care, she never was suspended or demoted. Id. at ¶27. While at Res-Care, the plaintiff never was denied a promotion to an open and available position for which she was the most qualified candidate. Id. at ¶28.

Reinhold has no knowledge of Stahl ever lodging a complaint of any kind, including any complaint of discrimination or harassment. Id. at ¶24.

E.    Conclusions of Law

The fact that the plaintiff never fully complied with discovery, that her allegations are vague and that she never took the opportunity to amend the complaint (despite court-approved extensions of time to do so) have made analysis of her claims difficult. The plaintiff filed her initial complaint ("Complaint for a Civil Case") on October 15, 2017, and attached a second complaint for ("Complaint for Violation of Civil Rights") to the initial complaint. Dkt. Nos. 1, 1-1. Judge Peterson screened the complaint and allowed the plaintiff to proceed on claims under Title VII, the Equal Pay Act and the Fair Labor Standards Act. Dkt. No. 5 at 1. He summarized the allegations as follows:

> Several times, Dawson's supervisor, defendant Stacey Ellis, made unwanted sexual advances and suggestive jokes or comments. Dawson says that Ellis "sabotage[d]" her and issued her "corrective action." Dkt. 1, at 6. She also says that she was repeatedly harassed by another employee, named Mary Dixon. Dawson

28

> complained about all of the harassment but Res-Care did not correct the problem.

Id. at 2. Judge Peterson explained that Res-Care was the appropriate defendant for the plaintiff's Title VII claims, including hostile work environment (by Ellis and Dixon), *quid pro quo* harassment and/or retaliation (depending on the evidence). Id. at 3. Judge Peterson allowed the plaintiff to proceed against Res-Care on her theory that Res-Care violated the Equal Pay Act by paying Stahl more than her for performing the same role.

The court has dismissed the FLSA claim against the individual defendants. That leaves the Equal Pay Act and Title VII claims against Res-Care. The court will deny the plaintiff's first motion for summary judgment (Dkt. No. 127) because she did not comply with the rules and proposed three facts without any citations to record evidence. The court already has stated that it will not consider the plaintiff's second motion for summary judgment because it was not timely filed. The court will address each of the remaining claims below through the lens of the defendants' summary judgment motion.

1. *Equal Pay Act*

To survive summary judgment on the Equal Pay Act claim, the plaintiff must provide evidence that shows that (1) higher wages were paid to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities and (3) the work was [also[ performed under similar working conditions." Stopka v. All. of Am. Insurers, 141 F.3d 681, 685 (7th Cir. 1988). The plaintiff's claim fails at the first element because the record contains no

evidence that higher wages were paid to a male employee for equal work under similar conditions.

In her complaint and deposition, the plaintiff identified James Stahl as the sole comparator. The undisputed facts in the record establish that the plaintiff and Stahl started work the same day, were terminated the same day and were paid $19.23 or $19.24 per hour while employed by Res-Care. Dkt. Nos. 130 at ¶8; 135-2 at 2, 14-44; 135-4 at 2-33. The plaintiff challenges the authenticity of the supporting documents, but the information in them is supported by the affidavit of Reinhold, who is familiar with Res-Care's record-keeping practices. The plaintiff has neither produced nor identified any evidence in opposition to summary judgment with respect to the Equal Pay Act claim that would create a genuine issue of material fact. The court will dismiss that claim.

### 2. *Title VII*

When screening the complaint, Judge Peterson identified several different Title VII claims, including unlawful termination, hostile work environment, *quid pro quo* harassment and retaliation. Dkt. No. 5 at 3. He inferred that the plaintiff was alleging that Dixon and Ellis's actions created a sex-based hostile work environment. Id. at 3-4. He found the allegations about *quid pro quo* harassment too vague as to distinguish that claim from the retaliation claim. Id. at 4. Judge Peterson said it was unclear whether the plaintiff was saying that she was fired for rejecting Ellis's advances or for complaining about the advances, but that either way, the plaintiff had stated a Title VII claim that "for

the time being [he would] refer to as a retaliation claim." Id. at 4-5. He observed that the plaintiff would have to show what Ellis did to harass her and how that affected her employment. Id. at 5.

> a.      Sex-Based Harassment/Hostile Work Environment

"A sexually hostile or abusive work environment is a form of sex discrimination under Title VII." E.E.O.C. v. Mgmt. Hosp. of Racine, Inc., 666 F.3d 422, 432 (7th Cir. 2012). To prevail on a hostile work environment claim under Title VII, a plaintiff must show that "(1) the plaintiff's workplace was both subjectively and objectively offensive; (2) the plaintiff's sex was the cause of the harassment; (3) the harassment was severe or pervasive; and (4) there is a basis for employer liability." Milligan-Grimstad v. Stanley, 877 F.3d 705, 713–14 (7th Cir. 2017).

When considering whether a workplace is objectively hostile, the court considers "the totality of the circumstances." Alamo v. Bliss, 864 F.3d 541, 549 (7th Cir. 2017). These circumstances include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys. Inc., 510 U.S. 17, 23 (1993). The Seventh Circuit has not identified a "magic number" of instances required to demonstrate a hostile work environment. Bliss, 864 F.3d at 550 (citation omitted). "A severe episode that occurs as rarely as once and a relentless pattern of less harassment both may violate Title VII." Id.

The plaintiff identified two individuals whom she alleged had harassed her: Mary Dixon and Stacey Ellis. Dixon did not work for Res-Care. Dkt. No. 135 at ¶6. Nor is there any evidence in the record to suggest that Dixon's comments (which appear to have involved her giving clients the contact information for the plaintiff's supervisor and perhaps encouraging them to file complaints against the plaintiff) were based on the plaintiff's gender.

That leaves the alleged statements by the plaintiff's supervisor, Ellis. In the complaint, the plaintiff alleged that Ellis abused her authority and "on several occasion mad [sic] unwelcome sexual advances, sexual comments, sexual suggestive jokes, and other verbal conduct of a sexual nature." Dkt. No. 1 at 6. Although not required to do so, the court has scoured the record in search of any evidence that supports these allegations. In support of their summary judgment motion, the defendants filed a "true and accurate copy" of the letter that the defendants say the plaintiff sent the Equal Rights Officer. Dkt. No. 136 at ¶3; 136-2 at 1. In that letter, the plaintiff said that on "several occasions" Ellis made inappropriate sexual jokes or comments in the plaintiff's presence and in group settings. Dkt. No. 136-2 at 8. She said that Ellis called Ms. Knight (also employed at Res-Care) "a cunt" and that, during a "one on one meeting in Kenosha County," said "I'm not going to suck anyone's dick, to get to the top." Id. The plaintiff admitted that she was "unsure if Ms. Ellis was implying that the [the plaintiff] performed sexual acts to obtain employment and or insinuate[d] [the plaintiff] would for a promotion." Id.

32

Even if the court found these statements to be subjectively and objectively offensive and based on the plaintiff's gender, the alleged statements don't rise to the requisite level of severity to support a claim. The plaintiff says that Ellis made the jokes in group settings on several occasions; the court has no other information regarding the alleged harassment. There is no evidence that the plaintiff ever reported any harassment as required under the company policy or that she made Res-Care aware of her allegations prior to her termination. She does not identify the number of occasions on which Ellis allegedly made the jokes or comments, or the dates, or who was present. James Stahl and defendants Reinhold, Klett, Rudzianis, Dzeidzic and Ellis aver they knew nothing of the plaintiff being subjected to discrimination. Dkt. Nos. 130 at ¶7; 131 at ¶5-7, 9-10; 132 at ¶¶5-6, 8; 133 at ¶¶6, 8; 134 at ¶¶4-9, 11; 135 at ¶¶234. It is unrefuted that Amanda Klett, the Manager of Human Resources, was not aware of any complaint by the plaintiff. Dkt. No. 131 at ¶7.

Put simply, the plaintiff has not identified sufficient record evidence to create a genuine dispute as to the material fact of whether Ellis created a hostile work environment based on the plaintiff's gender.

> b.   Retaliatory Discharge

Judge Peterson also allowed the plaintiff to proceed on a retaliation claim. In pursuing a retaliation claim under Title VII, "plaintiffs must offer evidence of three elements: (1) they engaged in protected activity; (2) they suffered adverse employment actions; and (3) there was a causal connection

33

between the protected activity and the adverse employment actions." <u>Castro v. DeVry Univ., Inc.</u>, 786 F.3d 559, 564 (7th Cir. 2015).

The plaintiff has not identified a genuine issue of material fact sufficient to survive summary judgment on a retaliation claim. First, she has produced no evidence that she was engaged in any protected activity related to her termination. The only known "complaint" from the plaintiff was an email sent to Karen Burns, a regional director of an unrelated business operating in the same building as Res-Care, about one of its employees, Mary Dixon. Neither Burns nor Dixon were employed by Res-Care.

More important, there is no evidence of a causal connection between any protected activity by the plaintiff and her termination. Reinhold made the decision to terminate the plaintiff's employment based on a violation of company computer systems security policy. Dkt. No. 135 at ¶21. The plaintiff never complained to Reinhold about discrimination. <u>Id.</u> at ¶23. The plaintiff never asked Reinhold to investigate a claim of discrimination. <u>Id.</u> The plaintiff never sent an email to Reinhold describing discriminatory, harassing or retaliatory conduct. <u>Id.</u> Even the plaintiff admitted in her deposition that she does not know what Reinhold considered before she was terminated. Dkt. No. 136-1 at 4, Tr. p. 108, lines 6-25. Meanwhile, Klett avers that she reviewed the determination that the plaintiff had violated company policy before discipline was issued. Dkt. No. 131 at ¶3, 4. Klett avers that she was not aware of any Res-Care employee discriminating, harassing or retaliating against the plaintiff. Id. at ¶10. There is no evidence in the record that the plaintiff ever engaged in

34

protected activity beyond the allegations in her complaint. The plaintiff cannot survive summary judgment by relying solely on unsupported, conclusory allegations.

Finally, the record establishes that the decision to terminate the plaintiff was made by Reinhold in conjunction with Human Resources after he learned that the plaintiff had violated company policies by using Stahl's XAR number and login credentials to access information systems. Dkt. No. 135 at ¶¶20, 21. Stahl was terminated on the same day for the same violations; there is no evidence that this cited policy violation was pretextual. Id.

On this record, the court must grant the defendants' motion for summary judgment and dismiss the case.

## IV. Conclusion

The court **GRANTS** the defendants' motion for attorneys' fees and costs under Rule 37(a)(5). Dkt. No. 120. The plaintiff must pay the defendants the sum of **$10,000**, **no later than fourteen days following the entry of judgment**.

The court **DENIES** the plaintiff's motion to dismiss award of attorney fees. Dkt. No. 124.

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 126.

The court **DENIES** the plaintiff's motion for summary judgment. Dkt. No. 127.

35

The court **DENIES AS UNTIMELY** the plaintiff's second motion for summary judgment. Dkt. No. 147.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 3rd day of January, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**